## MIDLAND STEEL COMPANY *v.* DAUGHERTY.

[No. 3,360.   Filed February 19, 1901.]

TRIAL.— *Verdict.—Answers to Interrogatories.*—The general verdict finds all the material facts averred by the party in whose favor it is returned to be true, and is supported by all reasonable presumptions and intendments, and it can only be overcome by the specific findings of fact in answer to interrogatories, if such findings, without conflict among them, and without the aid of any presumptions in their favor, state facts in irreconcilable conflict with the general verdict.  *pp. 275, 276.*

SAME.—*Presumption.—Evidence.*—A finding of specific facts in answer to interrogatories will not control a general verdict for plaintiff, where it was possible under the allegations of the pleadings to have proved other specific facts not inconsistent with those specially found which would show plaintiff entitled to recover.  *pp. 276-278.*

From the Delaware Circuit Court.   *Affirmed.*

*W. H. H. Miller, J. B. Elam, J. W. Fesler* and *S. D. Miller,* for appellant.

*J. N. Templer, C. C. Ball* and *E. R. Templer,* for appellee.

ROBINSON, J.—Upon the first appeal in this case the judgment of the trial court was reversed because of error in sustaining a motion in arrest of judgment. *Daugherty* v. *Midland Steel Co.,* 23 Ind. App. 78. The motion in arrest was then overruled, and judgment rendered on the general verdict in appellee's favor. From that judg-

ment this appeal is prosecuted, and the only question discussed is that the court erred in overruling appellant's motion for judgment on the jury's answers to interrogatories.

The jury answered that appellee is thirty-one years old; on October 10, 1895, he had been working for about three months in appellant's open hearth department; in connection with the furnaces were used two pits in which were placed moulds weighing about 2,000 pounds, and in which were cast ingots or billets of steel about four feet long and of different thicknesses, and weighing 1,000 to 2,400 pounds; for the purpose of lifting the moulds and ingots from the pit, the company used a hydraulic crane, consisting of an upright cylinder in which was a piston to which was attached a horizontal beam about twenty feet long, so constructed as to be given a rotary motion covering the whole area of the pit; this beam carried a trolley running upon wheels, and on the underside of the trolley were four heavy metal chains, on the lower end of which were hooks for attaching objects to be moved; by forcing water into the cylinder, the piston and beam were raised, and objects attached to the chains could be swung around to any desired place within sweep of the beam; the water was turned in and shut off by means of levers. Just before appellee was injured, ingots, to which he assisted in attaching the chains, were raised from the pit and swung around to be let down, when a hook of one of the chains caught to one of the ingots. The man in charge of the beam then caused it to move to loose the chain. At this time the trolley was standing out further toward the end of the beam than opposite the place where the chain was fast, and when the beam was moved up this caused the trolley to start suddenly toward the upright part of the crane, the chain came loose, and the four chains swung violently toward appellee, one of them striking him. Appellee was standing between where the trolley then was and the upright part of the crane,

remained there until after the chain was loosed and a fellow workman called to him, saw the crane pull the fastened chain without making any effort to get out of reach of the chain when the crane started until the chain parted from the ingot. In the pit where appellee worked, and plainly visible, there had been quantities of scrap, dirt, sand, clay, brick, and steel billets, for six days or more, and on account of these there was not room safely to work on the side of the pit, and had they not been there he would have had more room; there were billets or ingots lying on top of the dirt, sand, etc., which was not the proper place for them, and it was while removing these billets that appellee was hurt; the place where appellee worked was sufficiently lighted. The crane was out of repair because of leaking valves, the water valves on the hydraulic pumps were worn, untrue, and out of repair, did not fit tight in their seats, causing the pump to leak badly; these defects caused the crane to move irregularly; the leakage lessened the power by which the crane was operated and made it more difficult to control; it was more difficult to manage and more dangerous because of its moving irregularly, and because "the force had to be applied more suddenly, the crane was harder to start, and when started could not be readily stopped", the diminution of the power which operated the crane made it more difficult to stop it because of force thrown on suddenly, and the diminution of the power operating the crane affected the control and starting and stopping the same when there was no load "by jerking the chain loose from the ingot." The water that raised the beam passed in at the bottom, and the leakage lessened the pressure, and jerks, or sudden and uncontrollable motions, were imparted to the crane "by opening wide the valves and suddenly applying all the available pressure"; the crane was rendered uncontrollable, "on account of being suddenly started it is not so easily stopped"; the motion of the crane which released the chain that struck appellee was an upward motion; the

catching of the hook on the ingot, the raising of the crane to loose the hook, the release of ·the hook, and the sudden motion of the trolley and the consequent swinging of the chain to and against appellee was the proximate cause of his injury; the movement of the crane to get the chain loose and the jerking loose of the chain was the cause of appellee's injury; it was the duty of the ingot gang to keep the space about the casting pits clear; it would take from fifteen to thirty minutes to put on new valves which appellant kept ready for use; after the hook broke loose from the ingot there was not time and no effort was made to stop the motion before the chain struck appellee; the backward motion of the trolley on the beam toward the upright part of the crane was caused from the fact that the trolley was further from the upright part than was the chain where it was fast to the ingot, and then the chain tightened by raising the beam; it was a very short time after the crane started to release the hook before appellee was struck; after the trolley started back the stopping of the beam would not have stopped the motion of the trolley; there was no communication of power to the trolley from hydraulic pressure; the crane could not be promptly stopped by the party in charge of it. Appellee informed the superintendent that the crane was out of repair, and asked him when he would repair it, and the superintendent said he would have it repaired in four or five days. Such answers as call for conclusions and such as are conflicting with each other need not be further noticed.

It is unnecessary to refer to the numerous cases declaring the rules to be applied in determining whether a motion for judgment upon the answers to interrogatories should be sustained. The general verdict finds the material facts averred to be true, and all reasonable presumptions and intendments must be indulged in its favor. The specific facts found in answers to interrogatories must stand without any presumptions in their favor. To control, they must not only

be inconsistent with the general verdict, but must be consistent with each other. And in determining whether there is such a conflict that the special answers will control, all the specific facts found must be construed with any other facts that might have been proved under the issues.

The complaint is set out at some length in the opinion on the former appeal, and the defects in the crane and the difficulties in its operation are therein stated. The jury's answers set forth the effect of the leaky valves upon the management and control of the crane, and upon this question are not in conflict with the general verdict. It appears that when the power was applied, elevating the beam and stretching the chain beneath, the trolley to which one end of the chain was attached was nearer the outer end of the beam than the weight to which the other end was attached. This diagonal pull started the trolley running, and when the chain came loose carried the chains with it. It is evident that if a great force was suddenly applied to raise the beam, the more rapid would be the movement of the trolley, and it would go further toward the inner end of the beam after the chain came loose. The jury find that because of the leaky valves the force had to be applied more suddenly, that the crane was harder to start, and when started could not be readily stopped. It is found that the crane was operated by the force of the water in the hydraulic pump, and that the check valves in the pump were worn, untrue, and out of repair, causing the pump to leak badly; it is found also there were no check valves in the upright cylinder. The fact that this leakage lessened the force by which the crane was operated would not necessarily make the sudden starting of the cylinder by applying the available force suddenly an impossibility.

The complaint avers that on or about the last day of September, 1895, and within about ten days before the injury, appellee made complaint of the defective crane; that appellant induced appellee to continue, by promising that within

Midland Steel Co. *v.* Daugherty.

a reasonable time it would make the repairs, and by promising to remove the scrap, dirt, billets, moulds, etc., from the pit; that soon after making the promises, and while they remained in force, and when sufficient time for their fulfilment had elapsed, to wit, within six days after the promise was made and when the same was wholly unfulfilled, and when appellee believed and had good reason to believe appellant still intended to fulfil the promise, and while appellee was working in the pit and the service was not so imminently dangerous that a man of ordinary prudence would have refused to work therein, the crane, in spite of the efforts of the persons operating it to stop it, moved swiftly, causing the chains to strike appellee. The findings show the superintendent promised to make the repairs within four or five days; that the injury occurred October 10, 1895. It is argued that where a definite time is fixed within which repairs are to be made, and such time passes without repairs, as the employe knows, then the force of the promise is expended.

In the complaint the promise relating to the defective crane is averred to have been a promise to repair within a reasonable time, and it is averred that complaint was made of the defect on or about the last of September, and "within about ten days prior to the date" of the injury. The complaint avers the injury occurred within six days after the promise was made. The answers do not show the exact date of the promise, but do show the injury occurred October 10th. Under the averments of the complaint, the promise to repair may have been made after the last of September, and there need not necessarily have been only one complaint about the defect. For the purpose of aiding the answers we can not presume that the complaint of the defects made by appellee and referred to in the answers was made on the last of September. It does not necessarily follow from the answers, when construed in connection with material facts which could have been found by the general verdict, that the

promise to repair had expired four or five days before the injury occurred. It is unnecessary to repeat here what was said in the opinion on the former appeal on the question of a promise to repair.

As we construe the answers, we can not conclude that there is an irreconcilable conflict between the answers and the general verdict on this question. The rights and liabilities of the parties growing out of a promise to repair have recently been carefully considered by this Court and the Supreme Court in the case of *McFarlan Carriage Co.* v. *Potter,* 21 Ind. App. 692, and *McFarlan Carriage Co.* v. *Potter,* 153 Ind. 107. The principles announced in those cases are controlling in the case at bar.

Judgment affirmed.